IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

01 APR -3 AM 10: 48

GUADALUPE HERNANDEZ; DAVID
BRIDGEMAN and JUDY BRIDGEMAN,
as parents and next friends
of DAVID EUGENE BRIDGEMAN, a
minor; JOHN PURDY, as parent
and next friend of`ERNIE
HERNANDEZ PURDY, a minor; and
BENNIE G. DAVIS, as guardian
ad litem and next friend of
ALFONSO HERNANDEZ, RAYMUNDO
HERNANDEZ, and CHRISTINA
HERNANDEZ, minors,

     Plaintiffs,

v.

No. CIV-00-1456 WWD

BRENDA RAPP, in her personal
capacity acting under color of
state law; NORMA BARELA, in her
personal capacity acting under
color of state law; JIM SMITH,
in his personal capacity acting
under color of state law;
NICHOLAS DAGONES, in his personal
capacity acting under color of
state law; KELLY ROBBINS, in her
personal capacity acting under
color of state law; JOHN DOES 1
THROUGH 6, in their personal
capacities acting under color of
state law; and JANE DOES 1
THROUGH 6, in their personal
capacities acting under color of
state law,

    Defendants.

### SECOND AMENDED COMPLAINT

<u>JURISDICTIONAL ALLEGATIONS</u>

    1.   This action arises under the provisions of the fourteenth

amendment to the United States Constitution pursuant to 42 U.S.C.

§ 1983 and under the laws of the State of New Mexico.

    2.   Plaintiff Guadalupe Hernandez, David Eugene Bridgeman



(formerly known as David Hernandez), Ernie Hernandez Purdy
(formerly known as Ernesto Hernandez), Alfonso Hernandez, and
Raymundo Hernandez ("the Hernandez boys," or "the boys") are
brothers.   Christina Hernandez is their sister.   The Hernandez
children were, during the events giving rise to this action,
residents of Artesia, Eddy County, New Mexico.   All except
Guadalupe are still minors.

3.   Plaintiffs David and Judy Bridgeman are residents of
Oklahoma.  They are the adoptive parents of David Eugene Bridgeman,
and they are acting as his next friends in prosecuting this action
on his behalf.

4.  Plaintiff John Purdy is a resident of Oklahoma.  He is the
adoptive father of Ernie Hernandez Purdy, and he is acting as
Ernie's next friend in prosecuting this action on Ernie's behalf.

5.  Plaintiff Bennie G. Davis is a resident of Carlsbad, Eddy
County, New Mexico.  He is the duly appointed guardian ad litem of
Alfonso Hernandez, Raymundo Hernandez, and Christina Hernandez, and
he is acting as their next friend in prosecuting this action on
their behalf.

6.   At all times material to this lawsuit, Defendant Brenda
Rapp ("Rapp") was a resident of Artesia, Eddy County, New Mexico,
was employed as a social worker by the Children, Youth and Families
Department of the State of New Mexico or by its predecessor,
formerly known in part as the Human Services Department of the
State of New Mexico ("CYF"), and was responsible in part for the
placement, supervision, and monitoring of the Hernandez children

2

while they were in CYF custody.

7.   At all times material to this lawsuit, Defendant Norma Barela ("Barela") was a resident of Artesia, Eddy County, New Mexico, was employed as a social worker by CYF, and was responsible in part for the placement, supervision, and monitoring of the Hernandez children while they were in CYF custody.

8.   At all times material to this lawsuit, Defendant Jim Smith ("Smith") was a resident of Artesia, Eddy County, New Mexico, was employed as a supervisor by CYF, and was responsible in part for the placement, supervision, and monitoring of the Hernandez children while they were in CYF custody.

9.   At all times material to this lawsuit, Defendant Nicholas Dagones ("Dagones") was a resident of Artesia, Eddy County, New Mexico, was employed as a supervisor by CYF, was responsible in part for the placement, supervision, and monitoring of the Hernandez children while they were in CYF custody, and upon information and belief had supervisory authority over one or more other Defendants with respect to such placement, supervision, and monitoring.

10.   At all times material to this lawsuit, Defendant Kelly Robbins ("Robbins") was a resident of Artesia, Eddy County, New Mexico, was employed as a county office manager by CYF, was responsible in part for the placement, supervision, and monitoring of the Hernandez children while they were in CYF custody, and had supervisory authority over the other Defendants with respect to such placement, supervision, and monitoring.

11. As supervisors, Defendants Dagones and Robbins were responsible for the training, supervision, review, and control of their subordinates in all phases of their duties to secure proper disposition of abused and neglected children within their jurisdiction and to monitor and ensure these children's well-being and welfare.

12. At all times material to this lawsuit, Defendants John Does 1 through 6 and Jane Does 1 through 6 were employed by CYF as social workers or supervisors and had direct or supervisory authority with respect to the placement, supervision, and monitoring of the Hernandez children while the children were in CYF custody. Plaintiffs do not currently know these Defendants' identities but expect to discover them in this action.

13. At all times material to this lawsuit, Defendants acted in the scope of their duties as public employees, were state actors, and acted under color of state law.

14. This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Venue is proper in this judicial district under 28 U.S.C. § 1391.

GENERAL ALLEGATIONS

15. The Hernandez siblings are the children of Dora and Rafael (or "Ralph") Hernandez. Guadalupe, or "Lupe," was born on October 23, 1981; David was born on April 13, 1983; Ernesto, or "Ernie," was born on December 22, 1984; Alfonso, or "Fonzie," was born on January 26, 1986; Raymundo, or "Raymond," was born on December 22, 1986; and Christina was born on January 22, 1988.

4

16.   On or about August 18, 1987, Ralph Hernandez severely beat and shot at Dora Hernandez, at a time when Dora was pregnant with Christina.   When law enforcement officers arrived at the scene, Ralph appeared to be under the influence of drugs or alcohol, and he proceeded to use his sons as a shield between himself and the officers.   Eventually he surrendered and was taken to jail.   Dora was taken to the hospital.

17.   On August 19, 1987, CYF social worker Billie Garcia went to the Hernandezes' Artesia trailer home to investigate.   She promptly removed the Hernandez boys from the home and swore out an affidavit in support of a petition for an order formally granting legal custody to CYF.   In addition to relating the events that had left the boys without parents, the affidavit described a filthy, malodorous, chaotic household without any running water or functioning plumbing:

> The commode in the bathroom was filled to the top with excrement and the bathtub was filled with murky water which appeared to have a greasy film on top and smelled of urine....
> The bedroom which appeared to belong to the children contained one mattress leaning against the wall and was completely littered ankle deep with rags and clothing.   In the kitchen there was a pot with moldy food and water in the sink and there [were] also long strands of black hair in the sink.   The counter tops were crusted with dried food and grease ....   There were hypodermic syringes on the kitchen cabinets.

18.   On the strength of this affidavit, District Judge Harvey Fort issued an ex parte order granting CYF's petition for temporary legal and physical custody.   The boys were immediately placed in foster care.

5

19.  At a hearing held on October 27, 1987, and by order dated December 28, 1987, Judge Fort awarded CYF physical and legal custody of the Hernandez boys for up to two years, subject to review every six months.

20.  Christina was born less than a month after entry of this order; and on April 21, 1988, citing her mother's severe neglect, CYF removed Christina from her parents' home as well.  At a hearing held on July 19, 1988, and by order dated August 16, 1988, Judge Fort consolidated Christina's case with that of her brothers and awarded CYF physical and legal custody of Christina for up to two years, subject to review every six months.

21.  As custodians of the children, CYF and its employees, including Defendants, owed the children a duty to protect them from physical, sexual, and emotional abuse; a duty to exercise professional judgment in attempting to place the children in a safe environment free from physical, sexual, and emotional abuse, and in monitoring the conditions of that environment; and a duty to comply with NMSA 1978, § 32-1-38.1(F)(6) (1982) (superseded 1993), and with the terms of the consent decree entered in <u>Joseph A. v. New Mexico Department of Human Services</u>, 575 F. Supp. 346 (D.N.M. 1983), regarding permanent placement and termination of parental rights.  Moreover, even when the children were outside state custody, Defendants owed the children a duty not to create or enhance special dangers for them.  This obligation included the duty to exercise professional judgment in the preparation of reports and recommendations to the court; the duty to report

6

material facts to the court; the duty to refrain from supplying the court with knowingly or recklessly false reports concerning the children's situation; and the duty not to interfere with the protective services that would otherwise be available to the children.    Finally, to the extent that Defendants created or enhanced special dangers for the children, Defendants owed the children a duty to monitor those dangers and to rescue the children from them.

22.    On May 4, 1988, Ralph Hernandez was convicted of aggravated assault with a deadly weapon and four counts of child abuse, all stemming from the events of August 18 and 19, 1987.    He was sentenced to four years in prison and an additional year of probation.

23.    In mid- or late 1988, CYF designated Defendant Rapp as the children's case worker, and she continued in that capacity until at least September 1989.    On information and belief, Defendant Rapp abandoned professional judgment — and contravened NMSA 1978, § 32-1-38.1(F)(6), and the terms of the consent decree entered in <u>Joseph A. v. New Mexico Department of Human Services</u> — by failing to take steps to ensure that the children were adopted, and Dora and Ralph Hernandez's parental rights were terminated, within eighteen months after CYF became the children's custodian. Had Defendant Rapp exercised professional judgment, Ralph Hernandez would never have had an opportunity to gain custody of Christina or to regain custody of the boys, and the children would have been protected from the injuries they ultimately suffered in his home.

7

24. Defendant John Doe 1 or Jane Doe 1 replaced Defendant Rapp as the children's case worker in September 1989 or thereafter. Alternatively, Defendant Robbins failed to appoint a case worker for the children for several months after Defendant Rapp's departure. On information and belief, Defendant John Doe 1 or Jane Doe 1 or Robbins abandoned professional judgment — and contravened NMSA 1978, § 32-1-38.1(F)(6), and the terms of the consent decree entered in <u>Joseph A. v. New Mexico Department of Human Services</u> — by failing to take steps to ensure that the children were adopted, and Dora and Ralph Hernandez's parental rights were terminated, within eighteen months after CYF became the children's custodian. Had Defendant John Doe 1 or Jane Doe 1 or Robbins exercised professional judgment, Ralph Hernandez would never have had an opportunity to gain custody of Christina or to regain custody of the boys, and the children would have been protected from the injuries they ultimately suffered in his home.

25. By order dated January 4, 1990, District Judge Fred Watson, who had succeeded Judge Fort, extended CYF's physical and legal custody of the children for an additional year.

26. Defendant Barela replaced Defendant Rapp or Defendant John Doe 1 or Jane Doe 1 as the children's case worker in February 1990. On information and belief, Defendant Barela abandoned professional judgment — and contravened NMSA 1978, § 32-1-38.1(F)(6), and the terms of the consent decree entered in <u>Joseph A. v. New Mexico Department of Human Services</u> — by failing to take immediate action to commence the termination of parental rights and

8

to establish a permanent placement, and by recommending or acquiescing in CYF's ongoing efforts to place the children with Dora or Ralph Hernandez, despite the Hernandezes' demonstrated disregard for their children's welfare, and despite the passage of more than eighteen months since the children had been delivered to CYF's custody, and despite the known availability of foster parents willing and able to adopt the children.  Had Defendant Barela exercised professional judgment, Ralph Hernandez would never have had an opportunity to gain custody of Christina or to regain custody of the boys, and the children would have been protected from the injuries they ultimately suffered in his home.

27.   Defendant Robbins was, at all material times, the CYF county office manager who had supervisory power over Defendants Rapp and Barela and John Doe 1 or Jane Doe 1 and who had authority to formulate or approve a permanent placement plan for the Hernandez children.  On information and belief, Defendant Robbins abandoned professional judgment — and contravened NMSA 1978, § 32-1-38.1(F)(6), and the terms of the consent decree entered in <u>Joseph A. v. New Mexico Department of Human Services</u> — by failing to take steps to ensure that the children were adopted, and Dora and Ralph Hernandez's parental rights were terminated, within eighteen months after CYF became the children's custodian, and also by recommending or approving CYF's ongoing efforts to place the children with Dora or Ralph Hernandez.  Had Defendant Robbins exercised professional judgment, Ralph Hernandez would never have had an opportunity to gain custody of Christina or to regain custody of the boys, and the

children would have been protected from the injuries they
ultimately suffered in his home.

28. After his release from prison on May 2, 1990 — over two
years after CYF had been awarded custody of the children — Ralph
Hernandez returned to Artesia. Thereafter, Defendant Barela and/or
Defendant John Doe 2 and/or Defendant Jane Doe 2 commenced efforts
to place the Hernandez children with Ralph Hernandez, despite his
previous severe neglect of the children, and despite his conviction
on four counts of child abuse, and despite his prior history of
alcohol and substance abuse, and despite an earlier decision by CYF
to work toward termination of his parental rights, and despite the
known availability of foster parents willing and able to adopt the
children. This course of action constituted an abandonment of
Defendants' professional judgment. On information and belief,
Defendant Robbins abandoned her professional judgment by devising
or endorsing the plan.

29. At a hearing held on February 8, 1991, and by order dated
March 4, 1991, Judge Watson extended CYF's custody of the children
for another year, but directed CYF to "increase visitation and
continue to phase the children in to the Ralph Hernandez home." On
information and belief, the court issued this order on the
recommendation of Defendant Robbins and/or Defendant John Doe 3
and/or Defendant Jane Doe 3, which recommendation was made in an
abandonment of professional judgment.

30. Pursuant to this order, all six Hernandez children were
delivered to Ralph Hernandez's physical custody between May and

10

August 1991. CYF retained legal custody of the children, and thus retained the duty to provide the children with a safe environment free of physical, sexual, and emotional abuse.

31. Almost immediately, Defendant Robbins and other CYF employees began receiving reports that called Ralph Hernandez's parental fitness into question. For example, on July 6, 1991, CYF case worker Cynthia Gibson detected alcohol on Ralph's breath, contrary to his insistence that he had quit drinking. In a report dated July 30, 1991, court-appointed special advocate Ruby Leamon documented several instances in which Ralph had left the children home alone. Leamon also reported that one of the children had witnessed Ralph holding another child's hand over a flame on the gas stove; and Leamon's personal inspection had turned up burns on two of the children's hands.

32. But on September 18, 1991, Defendant Jim Smith — a social worker supervisor with CYF's Family Preservation Services in Eddy County — wrote a memo to Cynthia Gibson that sided with Ralph in the strongest possible terms. Claiming to have spent 90 hours on the Hernandez file in August and September 1991, including "34.5 hours ... of face-to-face contact / counseling with the family," Smith denied seeing any evidence of abuse or neglect; he dismissed the concerns expressed by Ruby Leamon and others as "subjective inferences drawn from different values, norms, mores or cultural biases[,] possibly even ego projected judgements"; he accused all such observers of having "their own agenda[s]"; and he touted the superiority of his own "objective observations." Smith argued that

11

"the children must continue to live with their father, in their own home, together as one family," and he urged Gibson to "counterbalance" unfavorable reports about Ralph "with the larger, longer term objectives concerned with the importance of maintaining biological family integrity."

33.   This memo was the product of Smith's wholesale abandonment of professional judgment in investigating the children's situation and drawing conclusions from the readily available evidence.   For example, in violation of the norms of professional social work, Smith had given Ralph Hernandez abundant advance notice of each of his visits, thereby enabling Ralph to scrub the children, clean house, and hide evidence of his drinking before Smith's arrival.   More generally, despite representing himself as a uniquely "objective" evaluator of Ralph's parental competence, Smith subordinated the customary standards of social scientific observation — and the protective mission of CYF — to a personal preference for "maintaining biological family integrity."

34.   In the two months following Smith's memo, Ralph Hernandez stopped attending court-ordered counseling and dropped out of touch with CYF.   CYF continued to receive reports that Ralph was neglecting his children.   In a report dated November 14, 1991, the Citizen Review Board acknowledged these reports and noted that the children "act afraid of their father."   Largely because of the Smith memo, however, the Board concluded that Ralph "ha[d] [not] proven to be inappropriate as a parent."   In this respect and others, Smith's actions endangered the children by interfering with

12

the protective services that would otherwise have been available to them.

35. During October and November 1991, schoolteachers kept logs on the Hernandez children. According to a January 1992 CYF report authored by Cynthia Gibson, the gist of these and other materials submitted by teachers and principals was that "the children are dirty, smell of urine, and fear their father." Conditioned by his experience with Defendant Smith to expect advance warning of any CYF efforts to monitor him, Ralph Hernandez instructed one principal not to allow CYF to interview his children without contacting him first.

36. Gibson's January 1992 report additionally noted that Ralph Hernandez had been referred to CYF for abuse or neglect five times in the previous four months, and that three of those referrals had been substantiated. Attached to the report were sheriff's reports and hospital records tending to show that in early December 1991, Ralph had administered a heavy beating to his pregnant girl friend.

37. By orders dated January 17 and January 27, 1992, Judge Watson extended CYF's legal custody of the children for 90 days. The orders directed Ralph Hernandez to undergo counseling and random drug testing.

38. On February 18, 1992, Fonzie Hernandez went to school with a large bruise on his forehead. He explained that Ralph Hernandez had kicked him and his brother Raymond because they were fighting. School personnel notified CYF. Court-appointed special

13

advocate Ruby Leamon recounted the incident in her report of March 12, 1992, which she sent to Defendant Robbins.

39.   Leamon also reported that Ralph Hernandez had ceased to attend court-ordered counseling; that he refused to cooperate with the children's teachers in devising educational plans; and that, according to one of the children, Ralph spent his evenings playing Nintendo games and only "sometimes" bothered to cook dinner.

40.   In a report dated March 20, 1992, Defendant Dagones acknowledged that Ralph Hernandez had stopped going to counseling and had been the subject of three substantiated referrals for abuse or neglect since the court had awarded him physical custody of the children.   Although Dagones recommended that CYF retain legal custody for another 90 days, he abandoned professional judgment by treating the extension as a formality rather than an opportunity for further evaluation of Ralph's parental fitness.   As he subsequently explained to the Citizen Review Board:  "The care that [Ralph] is providing will always be marginal.... [But CYF] cannot continue custody indefinitely."

41.   By order dated April 27, 1992, Judge Watson extended CYF's legal custody for an additional 90 days and directed Ralph Hernandez to return to counseling and submit to random drug screens.

42.   As Defendant Robbins and other CYF employees became aware, Ralph Hernandez tested positive for marijuana in May 1992 after dodging the court-ordered drug screens in March and April. He also continued to absent himself from counseling.

14

43.   In a report dated June 16, 1992, and sent to Defendant
Robbins and others, Ruby Leamon urged CYF and the court to
terminate Ralph Hernandez's custody of the children.   After
relaying the children's statements that Ralph frequently left them
alone at home, where they engaged in such activities as smoking in
the closet — and after observing that the children were embarrassed
at school because Ralph had given them skinhead haircuts — Leamon
wrote that the worrisome reports

> continue to come in:  the children are losing
> ground at school, they are appearing to be
> physically neglected, they seem to be lacking
> the nurturance needed to make them emotionally
> healthy.  I have witnessed this myself:  Ralph
> used to take pride in their being clean and
> well dressed, now they always appear dirty and
> unkempt.   I don't know how to explain the
> deterioration I have seen since the children
> have been in Ralph's custody.   The teachers
> say th[e] "twinkle" has gone from their eyes.
>
> I remain concerned as to their physical
> safety as they have had several "accidents",
> and as there have been so many reports of
> their being unsupervised.  I especially worry
> about Christina's safety as the smallest and
> only female in a house full of men and boys,
> including all of Ralph's adult male friends.

44.   Case worker Cynthia Gibson also expressed profound
reservations.  In a report dated June 23, 1992, she noted that the
children's regular babysitter was an alcoholic who was "under
repeated investigation by [CYF] for neglect and abuse of her own
children."  She observed that Ralph had dropped out of college in
lieu of flunking out.  She pointed out that Ralph was not even
pretending to keep in touch with CYF.  She reported that "[t]he
home is beginning to deteriorate and has a rather strong smell of

urine.   [Ralph] leaves the children with several different men who
are known to the Artesia Police Department for unlawful acts
involving possession of marijuana, DWI, and other offenses."   And
she declared:   "The children appear to be unke[m]pt, dirty, and
unresponsive to outside stimul[i].   Their smiles have disappeared
and they seem to express fear of their caretakers, who [are]
usually not their father."

   45.   Although Ralph Hernandez resumed submitting to drug
tests, the test results only confirmed the dangers facing the
Hernandez children.   Ralph tested positive for marijuana on June
24, 1992, positive for alcohol on July 14 and 17, 1992, and
positive for amphetamines on July 15, 1992.

   46.  Once again, however, Defendant Smith intervened.  By memo
to Cynthia Gibson dated July 24, 1992, he claimed to have invested
another substantial period of time face to face with the Hernandez
family, and he argued that this "intensive intervention" and
investigation had left him singularly well positioned to evaluate
Ralph's abilities as a parent.  On that subject, Smith wrote, he
had no concerns whatsoever.   On the basis of his "objective
observations" — and his "experience, training and education" in
child protective services, which he described as superior to the
credentials of "any other person involved with this case" — Smith
declared that "the children are quite trusting, open, and
comfortable with their father."   He wrote that he never found the
children to be "unsupervised, or undersupervised."  If Ralph had a
substance abuse problem at all, Smith reasoned, it did not

16

interfere with his performance as a parent.    Pronouncing the
Hernandez home "fully acceptable in terms of hygiene, orderliness,
and safety," Smith concluded that the children "are consistently
cared for in terms of basic needs," and he ridiculed the contrary
views of the children's teachers and court-appointed special
advocate as "value-laden assumptions originating from personal, but
ethnocentric viewpoints."

    47.   This memo, like its September 1991 predecessor, embodied
an abdication of Smith's professional judgment.  On information and
belief, Smith did not spend nearly as much time with the Hernandez
family in June and July 1992 as his report suggested, but instead
relied almost exclusively on the observations he had made ten
months earlier.  Had he in fact engaged in the quantity of "face-
to-face contact" that he claimed to have had with the Hernandezes,
he could not have helped noticing the deterioration in Ralph
Hernandez's habits, in Ralph's relationships with the children, and
in the Hernandez household.    Alternatively, if Smith did spend
significant time with the subjects of his memo, he gave them so
much advance warning of his visits that his observations were
completely unrepresentative of their daily lives.  Finally, as he
had in September 1991, Smith permitted his professional judgment to
take a back seat to the "empowering philosophy" of biological
family protection.

    48.   On information and belief, Defendants Dagones and Robbins
— in an abandonment of professional judgment — used Smith's memos
to justify relinquishing custody of the children, despite the

                                17

biases apparent on the face of those memos, despite the objections and reservations expressed by Cynthia Gibson, Ruby Leamon, and other people who had day-to-day contact with the children and the home, and despite the overwhelming evidence that Ralph Hernandez was abusing and neglecting the children and returning to drugs and drink.

49.  On information and belief, Defendants Dagones and Robbins decided to ask the court to discontinue CYF's legal custody of the children.  Judge Watson granted this request at a hearing held on September 24, 1992, and by order dated October 14, 1992.  On information and belief, Judge Watson was decisively influenced by Defendant Smith's memos, as well as by Dagones and Robbins's reliance on those memos.  Dagones, Robbins, and Smith knew that Judge Watson would rely on their collective recommendation to give Ralph Hernandez legal custody of the children; and they also knew that, but for their recommendation to transfer custody to Ralph Hernandez, Judge Watson would not order such a transfer.  Judge Watson did rely on Smith's reports and on the collective recommendations of Smith, Dagones, and Robbins, but Judge Watson would not have relied on those reports and recommendations had he known that they were made in the utter abandonment of professional judgment, that they omitted material facts regarding the Hernandez home, and that Smith, Dagones, and Robbins rendered them with knowledge of their falsity or in reckless disregard of whether they were true or false.

50.  Before October 14, 1992, the Hernandez children had been

continuously in the legal custody of CYF since August 19, 1987.

51.   In February and March 1993, CYF employees interviewed Christina in response to allegations of physical abuse, and Christina reported that Ralph had spanked her brothers with a "wire" when he learned that they had spoken with social workers at school.  Defendant John Doe 4 and/or Defendant Jane Doe 4, in an abandonment of professional judgment, took no action to remove the children from Ralph's home after receiving this report.  Defendants Robbins and/or Dagones and/or John Doe 6 and/or Jane Doe 6, in an abandonment of professional judgment, ratified this inaction.

52.   On August 19, 1993, Ralph Hernandez was arrested for being a felon in possession of a firearm.  Defendant John Doe 5 and/or Defendant Jane Doe 5, in an abandonment of professional judgment, took no action to remove the children from Ralph's home after learning of this arrest.  Defendants Robbins and/or Dagones and/or John Doe 6 and/or Jane Doe 6, in an abandonment of professional judgment, ratified this inaction.

53.  Both before and after October 14, 1992, when CYF's legal custody of the children was terminated, the children alternately suffered abuse and neglect — and endured repeated acts of physical, sexual, and emotional cruelty — at the hands of Ralph Hernandez and his friends.   In particular, Ralph and one Ruben Victor Garcia ("Ruben") consistently subjected the children to corporal punishment, especially when Ralph discovered that they had been speaking with social workers; Ruben sexually abused one or more of the boys; Ruben showed the children numerous pornographic videos,

19

which led the boys to attempt to emulate what they had seen by engaging in five-on-one group sex with Christina; and Ralph, under the influence of alcohol and drugs, anally sodomized Christina again and again.

54.   Not until November 23, 1993, when CYF removed the children from Ralph's squalid home in response to a report of sexual abuse, did these horrors cease.   Ralph was eventually convicted of criminal sexual penetration in the first degree and sentenced to nineteen years in the penitentiary.   The children bear the emotional scars of their ordeal to this day.

COUNT I

55.   Plaintiffs reallege and incorporate the foregoing paragraphs as if they were fully set forth herein.

56.   The Hernandez children had a fundamental right, protected by the fourteenth amendment to the United States Constitution, not to be placed in an injurious and life-threatening environment by the State of New Mexico, through its departments, officers, employees, and agents, including Defendants.

57.   The children had a fundamental right, protected by the fourteenth amendment to the United States Constitution, to be safeguarded from physical, sexual, and emotional abuse and neglect while in state custody, as well as to be safeguarded from physical, sexual, and emotional abuse and neglect at the hands of the person into whose custody they were transferred by the State of New Mexico through its departments, officers, employees, and agents, including Defendants.

20

58. Defendants had a duty, enforceable under the fourteenth amendment to the United States Constitution, to ensure the safe and proper disposition of abused and neglected children within their custody and control, and to avoid placing such children in situations of greater danger than those from which Defendants removed the children in the first place, and to refrain from enhancing the special dangers to which the children were already subject, and to monitor and rescue the children from any special dangers to which Defendants' actions subjected them.

59. By removing the Hernandez children from their family home and asserting custody and control over them, Defendants assumed an affirmative duty — arising out of the special relationship among Defendants, the State of New Mexico, and children in the State's custody — to protect and supervise the children in any environment to which Defendants subsequently consigned them.   Defendants violated this duty knowingly, recklessly, or with deliberate indifference toward and callous disregard for the children's rights.

60. By placing the children with Ralph Hernandez (or by inducing the district court to order the placement) despite his demonstrated capacity for criminal violence, drug addiction, and child abuse, and by failing to adequately monitor that placement, and by failing to take steps to terminate the placement when it became clear to Defendants themselves that the Hernandez children were being physically abused and neglected, Defendants substantially departed from accepted professional judgment,

21

practice, or standards in such a way as to abdicate reliance on professional judgment, and knowingly or recklessly subjected the children to a grave danger that was known or obvious to Defendants. Defendants' conduct was conscience-shocking.

61.  Defendant Smith and/or Defendant Dagones and/or Defendant Robbins and/or Defendants John Does 1 through 6 and/or Defendants Jane Does 1 through 6 approved of, ratified, and/or authorized the physical and emotional abuse and neglect of the Hernandez children by reason of their knowledge of the abuse and neglect and their deliberately indifferent failure to intervene.

62.  Defendant Rapp and/or Defendant Barela and/or Defendant Robbins and/or Defendant Dagones and/or Defendants John Does 1 through 6 and/or Defendants Jane Does 1 through 6 approved of, ratified, and/or authorized the neglect of the Hernandez children by reason of their knowledge of the need to place the children promptly and permanently with a suitable custodian following the children's removal from their family home, and by Defendants' deliberately indifferent failure to do so.

63.  Defendant Dagones and/or Defendant Robbins and/or Defendant John Doe 6 and/or Defendant Jane Doe 6 approved of, ratified, and/or authorized the improper conduct of their subordinates, Defendants Rapp, Barela, Smith, and Does, for whom they had supervisory responsibility; and Defendants Dagones and Robbins and John Doe 6 and/or Jane Doe 6 were deliberately indifferent in failing to supervise the conduct of these subordinates, and manifested their abandonment of professional

22

judgment thereby.

64. The conduct of all Defendants was grossly negligent, as well as unlawful, deliberate, malicious, reckless, wanton, and conscience-shocking.

65. The conduct of all Defendants, as set forth above, deprived the Hernandez children of their fundamental constitutional rights.

66. As a direct and proximate result of Defendants' conduct as set forth above, the children suffered physical injury, pain, medical expense, developmental deficits, emotional distress, and severe mental anguish in connection with the deprivation of their constitutional rights.

WHEREFORE, Plaintiffs ask the Court to enter a judgment in their favor and against Defendants for the following:

A.   Compensatory damages for deprivation of the children's constitutional rights;

B.   Punitive damages in an amount sufficient to punish Defendants for intentional and reckless violations of the children's constitutional rights and to deter such violations in the future; and

C.   Reasonable attorneys' fees and costs of suit under 42 U.S.C. § 1988.

## COUNT II

67.   Plaintiffs reallege and incorporate the foregoing paragraphs as if they were fully set forth herein.

68.   The Adoption Assistance and Child Welfare Act, 42 U.S.C.

23

§§ 620-628, 670-679a, establishes requirements with which states
must comply in order to receive reimbursement for certain expenses
incurred in the provision of child welfare services.

69.  To participate in the program, a state must submit a plan
for approval by the Secretary of Health and Human Services.

70.  Pursuant to this Act, CYF and its agents, including
Defendants, are required to

> (A) report to an appropriate agency or
> official, known or suspected instances of
> physical or mental injury, sexual abuse or
> exploitation, or negligent treatment or
> maltreatment of a child ... under
> circumstances which indicate that the child's
> health or welfare is threatened thereby; and
>
> (B) provide such information with respect
> to a situation described in subparagraph (A)
> as [CYF] may have ....

42 U.S.C. § 671(a)(9).

71.  Defendants failed to report the known or suspected
instances of physical or mental injury or negligent treatment or
maltreatment of the Hernandez children, as required by the Act,
despite evidence that the children's health or welfare was being
threatened.

72.  Defendants' conduct was grossly negligent, as well as
unlawful, willful, deliberate, malicious, reckless, and wanton.

73.  As a direct and proximate result of Defendants' conduct
as set forth above, the children suffered physical injury, pain,
medical expense, developmental deficits, emotional distress, and
severe mental anguish in connection with the deprivation of their
statutory and constitutional rights.

24

74. The children were beneficiaries of the Act's requirements, and the Act unambiguously confers upon them (or upon their duly authorized representative) a right to enforce the requirements by private suit.

WHEREFORE, Plaintiffs ask the Court to enter a judgment in their favor and against Defendants for the following:

A. Compensatory damages for deprivation of the children's statutory and constitutional rights;

B. Punitive damages in an amount sufficient to punish Defendants for intentional and reckless violations of the children's statutory and constitutional rights and to deter such violations in the future; and

C. Reasonable attorneys' fees and costs of suit under 42 U.S.C. § 1988.

<u>COUNT III</u>

75. Plaintiffs reallege and incorporate the foregoing paragraphs as if they were fully set forth herein.

76. Defendants Dagones and Robbins and John Doe 6 and/or Jane Doe 6 were responsible for the training, supervision, review, and control of their subordinates in all phases of their duties to secure proper disposition of abused and neglected children within their jurisdiction and to monitor and ensure these children's well-being and welfare, yet Defendants Dagones and Robbins and John Doe 6 and/or Jane Doe 6 knowingly, recklessly, or with deliberate indifference toward and callous disregard for the Hernandez children's rights, failed to instruct, supervise, control, and

25

discipline on a continuing basis Defendants Rapp, Barela, Smith, and Does in their duties so as to refrain from depriving the children of their constitutional rights, privileges, and immunities.

77. Defendants Dagones and Robbins and John Doe 6 and/or Jane Doe 6 had knowledge — or, had they diligently and professionally performed their duties to instruct, supervise, control, and discipline their subordinates on a continuing basis, should have had knowledge — that the wrongs heretofore alleged were occurring or were about to be committed. These Defendants had the power and the duty to prevent or aid in preventing the commission of these constitutional and statutory violations, and could have done so through the exercise of professional judgment, yet knowingly, willfully, recklessly, or with deliberate indifference toward and callous disregard for the Hernandez children's rights, and in an abdication of professional judgment, failed or refused to do so.

78. Defendants Dagones and Robbins and John Doe 6 and/or Jane Doe 6 directly or indirectly, under color of state law, approved, authorized, or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of Defendants Rapp, Barela, Smith, and Does heretofore described.

79. As a direct and proximate result of the conduct of Defendants Dagones and Robbins and John Doe 6 and/or Jane Doe 6 as set forth above, the children suffered physical injury, pain, medical expense, developmental deficits, emotional distress, and severe mental anguish in connection with the deprivation of their

26

statutory and constitutional rights.

WHEREFORE, Plaintiffs ask the Court to enter a judgment in their favor and against Defendants for the following:

A.   Compensatory damages for deprivation of the children's constitutional and statutory rights;

B.   Punitive damages in an amount sufficient to punish Defendants for intentional and reckless violations of the children's constitutional and statutory rights and to deter such violations in the future; and

C.   Reasonable attorneys' fees and costs of suit under 42 U.S.C. § 1988.

COUNT IV

80.   Plaintiffs reallege and incorporate the foregoing paragraphs as if they were fully set forth herein.

81.   At all times material to this lawsuit, there was in full force and effect the following New Mexico statute, to which all Defendants were subject:

> [I]f [a] child has been in substitute care, including residential care, for a period of eighteen months or longer and the child cannot be returned to his parents, [the state shall] initiate termination of parental rights or permanent guardianship proceedings, unless there has been an affirmative showing that because of age or health the possibility of permanent placement is remote.

NMSA 1978, § 32-1-38.1(F)(6)(1982)(superseded 1993).

82.   This statute plainly mandated the initiation of proceedings to terminate parental rights with respect to any child who had been in state custody for eighteen months or longer. It

endowed the Hernandez children with a liberty interest in the timely termination of Ralph and Dora Hernandez's parental rights, or at least in the timely initiation of proceedings to terminate those rights.

83.  Defendant Rapp and/or Defendant Barela and/or Defendant Robbins and/or Defendant Dagones and/or Defendants John Does 1 through 6 and/or Defendants Jane Does 1 through 6 violated the statute by failing to initiate proceedings to terminate Ralph and Dora Hernandez's parental rights at any time after the Hernandez children's eighteenth month in state custody, even though it was obvious that the children could not and should not be returned to their natural parents, and even though nothing about the children's age or health made the possibility of permanent placement remote, and even though there were foster parents willing and able to adopt the children.

84.  By violating the statute, these Defendants deprived the Hernandez children of a liberty interest without due process of law.

85.  By violating the statute and failing to initiate proceedings to terminate Ralph and Dora Hernandez's parental rights, these Defendants deprived the Hernandez children of their due process right of meaningful access to the courts.

86.  The conduct of Defendants was grossly negligent, as well as unlawful, deliberate, malicious, reckless, wanton, and conscience-shocking.

87.  As a direct and proximate result of Defendants' conduct

28

as set forth above, the children suffered physical injury, pain, medical expense, developmental deficits, emotional distress, and severe mental anguish in connection with the deprivation of their constitutional rights.

WHEREFORE, Plaintiffs ask the Court to enter a judgment in their favor and against Defendants for the following:

A.   Compensatory damages for deprivation of the children's constitutional rights;

B.   Punitive damages in an amount sufficient to punish Defendants for intentional and reckless violations of the children's constitutional rights and to deter such violations in the future; and

C.   Reasonable attorneys' fees and costs of suit under 42 U.S.C. § 1988.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By _K Purcell_____
   William S. Dixon
   Charles K. Purcell
Post Office Box 1888
Albuquerque, New Mexico  87103
Telephone:  (505) 765-5900


BLENDEN LAW FIRM
   Dick A. Blenden
   James P. Blenden
Post Office Box 1446
Carlsbad, New Mexico  88220
Telephone:  (505) 887-2071


Attorneys for Plaintiffs

29

We hereby certify that
we have mailed the
foregoing pleading to

      Timothy V. Flynn-O'Brien
      500 Copper NW, # 102
      Albuquerque, N.M.  87102

      Randolph B. Felker
      911 Old Pecos Trail
      Santa Fe, N.M.  87501

this _3d_ day of _April_ , 2001.

_K. Purcell_

William S. Dixon