# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**GUADALUPE HERNANDEZ**;
**DAVID EUGENE BRIDGEMAN**;
**JOHN PURDY**, as parent and next friend of
**ERNIE HERNANDEZ PURDY**, a minor;
and **BENNIE G. DAVIS**, as guardian ad litem
and next friend of **ALFONSO HERNANDEZ**,
**RAYMUNDO HERNANDEZ**, and
**CHRISTINA HERNANDEZ**, minors,

      Plaintiffs,

      vs.                           **CIV. NO.  00-1456 MCA/WDS**

**BRENDA RAPP, NORMA BARELA**,
**JIM SMITH, NICHOLAS DAGONES**,
**KELLY ROBBINS, JOHN DOES**
**1 THROUGH 5**, and **JANE DOES**
**1 THROUGH 5**, in their personal
capacities acting under color of state law,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the following motions: ***Defendant Smith's Motion to Dismiss Third Amended Complaint*** [Doc. No. 77] filed on October 23, 2001; ***Defendant Nicholas Dagones and Kelly Robbins' Motion to Dismiss Plaintiffs' Third Amended Complaint on Basis of Qualified Immunity and Absolute Immunity and Memorandum in Support Thereof*** [Doc. No. 82] filed on October 26, 2001; ***Defendant Norma Barela's Motion to Dismiss Third Amended Complaint (Counts I & II) and Memorandum in Support Thereof*** [Doc. No. 85] filed on October 26, 2001; ***Defendant***

*Brenda Rapp's Motion to Dismiss Counts I & II of Plaintiffs' Third Amended Complaint on Qualified Immunity and Brief in Support Thereof* [Doc. No. 88] filed on October 26, 2001; and *Defendants Barela, Dagones, Rapp and Robbins' Motion to Dismiss Count IV of Plaintiffs' Third Amended Complaint for Qualified Immunity and Brief in Support Thereof* [Doc. No. 91] filed on October 26, 2001.  Having reviewed the submissions of the parties, the relevant law, and otherwise being fully advised in the premises, the Court finds that good cause exists for granting in part and denying in part *Defendant Smiths' Motion to Dismiss Third Amended Complaint* [Doc. No. 77]; granting in part and denying in part *Defendant Nicholas Dagones and Kelly Robbins' Motion to Dismiss Plaintiffs' Third Amended Complaint on Basis of Qualified Immunity and Absolute Immunity and Memorandum in Support Thereof* [Doc. No. 82], granting *Defendant Norma Barela's Motion to Dismiss Third Amended Complaint (Counts I & II) and Memorandum in Support Thereof* [Doc. No. 85]; granting *Defendant Brenda Rapp's Motion to Dismiss Counts I & II of Plaintiffs' Third Amended Complaint on Qualified Immunity and Brief in Support Thereof* [Doc. No. 88]; and granting *Defendants Barela, Dagones, Rapp and Robbins' Motion to Dismiss Count IV of Plaintiffs' Third Amended Complaint for Qualified Immunity and Brief in Support Thereof* [Doc. No. 91].

## I.   BACKGROUND

On October 18, 2000, Plaintiffs filed this civil action on behalf of six minor children who allegedly were subjected to abuse and neglect by their biological father as a result of the

-2-

acts and omissions of social workers and supervisors employed by the State of New Mexico's Human Services Department, now known as the Children, Youth, and Families Department (CYFD). Following a hearing on several pending motions, the Honorable C. LeRoy Hansen issued an order granting Plaintiffs leave to file the *Third Amended Complaint* on September 13, 2001. [Doc. No. 74.] Defendants Brenda Rapp, Norma Barela, Jim Smith, Nicholas Dagones, and Kelly Robbins responded by filing motions to dismiss the claims asserted against them in the *Third Amended Complaint*. [Doc. No. 77, 82, 85, 88, 91.] The case was then transferred to this Court. [Doc. No. 81.]

The *Third Amended Complaint* asserts that Defendants violated Plaintiffs' rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution. The *Third Amended Complaint* further asserts that Defendants violated a provision of the Adoption Assistance and Child Welfare Act, 42 U.S.C. § 671(a)(9), as well as a provision of the State of New Mexico's Children's Code, N.M. Stat. Ann. § 32-1-38.1(F)(6) (Michie 1978 & Supp. 1982) (repealed 1993). To redress these alleged violations, Plaintiffs' seek an award of damages and attorney fees pursuant to 42 U.S.C. §§ 1981, 1983, and 1988.

The facts alleged in the *Third Amended Complaint* can be summarized in the light most favorable to Plaintiffs as follows. Guadalupe Hernandez, David Eugene Bridgeman (f/k/a David Hernandez), Ernie Hernandez Purdy (f/k/a Ernesto Hernandez), Alfonso Hernandez, Raymundo Hernandez, and Christina Hernandez are the biological children of Dora Hernandez and Raphael "Ralph" Hernandez. While the family was residing in the

Artesia, New Mexico area on or about August 18, 1987, the children's father, Ralph Hernandez, beat and shot at their mother, Dora Hernandez, in the presence of the children. Dora Hernandez was pregnant with Christina Hernandez at that time, and she was taken to a hospital.  Ralph Hernandez was subsequently arrested, convicted of aggravated assault with a deadly weapon, and given a four-year prison sentence.  (Compl. ¶¶ 14-16, 21.)

On August 19, 1987, CYFD took temporary physical and legal custody of the five sons of Ralph and Dora Hernandez.  On December 28, 1987, a state children's court issued an order awarding physical and legal custody of the five sons to CYFD for a period of up to two years, subject to review every six months.  (Compl. ¶¶ 17-18.)

Christina Hernandez was born on January 22, 1988.  On April 21, 1988, CYFD removed her from her mother's custody based on her mother's severe neglect. On August 16, 1988, the children's court issued an order awarding legal and physical custody of Christina Hernandez to CYFD for a period of up to two years, subject to review every six months.  The children's court also consolidated Christina Hernandez's case with that of her five brothers. (Compl. ¶¶ 14, 19.)

During the period when the Hernandez children were in the custody of CYFD, Defendant Kelly Robbins was employed by CYFD as a county office manager, and Defendant Nicholas Dagones was employed by CYFD as a supervisor.  As such, Defendants Robbins and Dagones were responsible for the supervision and training of other CYFD personnel involved in this case.  (Compl. ¶¶ 8-10.)

Defendant Brenda Rapp was designated by CYFD as the Hernandez children's case worker from mid- to late 1988 until September 1989.  During that time, she did not take steps to ensure that the children were adopted and that the parental rights of Ralph and Dora Hernandez were terminated.  Defendant Rapp and her colleagues at CYFD knew of circumstances, including Ralph Hernandez's incarceration and Dora Hernandez's incapacity as a parent, which made it obvious that the six Hernandez children could not be reunited with their parents within the eighteen-month time limit for permanent placement of the children set forth in N.M. Stat. Ann. § 32-1-38.1(F)(6), CYFD policy and procedure, and the consent decree entered in Joseph A. v. N.M. Dep't of Human Servs., 575 F. Supp. 346, 354-65 (D.N.M. 1983).[1]  (Compl. ¶¶ 5, 20-22.)

After Defendant Rapp ceased working as the Hernandez children's case worker in September 1989, several months passed in which it is unclear whether another case worker (John Doe 1 or Jane Doe 2) was assigned to work with the Hernandez children, or whether Defendant Robbins failed to assign another case worker.  In any case, no action was taken to terminate the parental rights of Ralph and Dora Hernandez or to ensure that the Hernandez children would be adopted during this period.  Instead, by order dated January 4, 1990, the

---

[1]The consent decree in Joseph A. 575 F. Supp. at 355, was entered in settlement of claims for injunctive and declaratory relief brought on behalf of a class of children in state custody, "and no statement contained [t]herein shall be deemed an admission on any non-injunctive or non-declaratory issue."  The history of the Joseph A. litigation is summarized in Joseph A. v. Ingram, 275 F.3d 1253, 1257-59 (10th Cir. 2002), which concluded that some of the plaintiffs' claims in that litigation may run afoul of the absention doctrine articulated in Younger v. Harris, 401 U.S. 37 (1971), see Joseph A., 275 F.3d at 1265-74.

children's court extended CYFD's legal and physical custody of the Hernandez children for an additional year.  (Compl. ¶¶ 9, 23-24.)

Defendant Norma Barela was designated by CYFD as the Hernandez children's case worker from February 1990 to November 1990.  During this period, she did not take immediate action to terminate parental rights and seek adoption.  Instead, with the approval or recommendation of Defendant Robbins, Defendant Barela commenced or participated in efforts to place the children with their biological parents, despite knowing that the eighteen-month time limit for permanent placement of the children had already expired, that there were circumstances indicating the biological parents were unfit, and that foster parents willing and able to adopt the children were available.  (Compl. ¶¶ 6, 20-21, 25, 27.)

On May 2, 1990, the children's biological father, Ralph Hernandez, was released from prison, and he returned to the Artesia, New Mexico area.  In a letter to Defendant Barela dated September 6, 1990, a psychologist retained by CYFD to evaluate Ralph Hernandez opined that Mr. Hernandez's potential to serve as his children's primary caregiver depended on his abstinence from alcohol and drugs.  The psychologist also recommended that the children not be placed in Mr. Hernandez's home in the event that he failed to so abstain.  These recommendations were echoed in subsequent reports known to CYFD personnel. (Compl. ¶¶ 27-28.)

After Defendant Barela ceased working as the Hernandez children's caseworker in November 1990, another social worker or supervisor (John Doe 2 or Jane Doe 2) assumed that role and either commenced or continued efforts to place the children with their

biological father, Ralph Hernandez.  In her supervisory role, Defendant Robbins either devised or endorsed the plan to place the children with Ralph Hernandez.  Upon the recommendation of Defendant Robbins or another CYFD social worker or supervisor (John Doe 3 or Jane Doe 3), the children's court issued an order on March 4, 1991, extending CYFD's custody of the children for another year and directing CYFD to "increase visitation and continue to phase the children into the Ralph Hernandez home."  (Compl. ¶¶ 27, 29.)

No later than March 1991, while the Hernandez children remained in the legal and physical custody of CYFD, CYFD employees began receiving information that Ralph Hernandez had started drinking alcohol again, and they knew this information meant that the children would be in imminent danger of serious harm if placed in his custody. Nevertheless, Defendant Robbins and another CYFD supervisor, Defendant Dagones, approved and facilitated the delivery of all six Hernandez children to the physical custody of Ralph Hernandez between May 1991 and August 1991.  CYFD retained legal custody of the children at that time.  (Compl. ¶¶ 8, 30.)

Almost immediately after physical custody of the Hernandez children was transferred to Ralph Hernandez, Defendants Dagones and Robbins and other CYFD personnel continued to receive reports of Ralph Hernandez's suspected alcohol consumption and other information indicating his unfitness as a parent.  Defendants Dagones and Robbins failed to investigate or take appropriate action to protect the children based on these reports.  (Compl. ¶¶ 31, 33, 35.)

In August 1991, another CYFD social worker or supervisor, Jim Smith, began working with the newly reunited Hernandez family.  He also observed and reported behavior indicating that the children were at risk and that their father was not fit as a parent.  In particular, he noted behavior suggesting that Christina Hernandez had been sexually victimized and that Ralph Hernandez was using drugs.  Nevertheless, Defendant Smith remained steadfast in his recommendation that the children continue to reside with Mr. Hernandez.  Defendant Smith failed to investigate other reports of possible neglect or abuse and may have deliberately discounted and concealed information relevant to such investigation from other officials involved in the case (including the children's court). (Compl. ¶¶ 7, 32-37.)

By orders dated January 17, 1992, and January 27, 1992, the children's court extended CYFD's legal custody of the Hernandez children for ninety days and directed Ralph Hernandez to undergo counseling and random drug testing.  Despite his knowledge that Mr. Hernandez had stopped going to counseling and had been the subject of three substantiated referrals for abuse or neglect since obtaining physical custody of the children, Defendant Dagones only recommended that CYFD retain legal custody of the children for another ninety days, which the children's court ordered on April 27, 1992.  (Compl. ¶¶ 38-44.)

Shortly thereafter, it was reported to Defendant Robbins and other CYFD personnel that Ralph Hernandez had tested positive for drugs and that the children had been subject to further abuse and neglect.  At the request of Defendant Dagones, Defendant Smith conducted

a cursory investigation of the Hernandez family which resulted in a memorandum dated July 24, 1992, in which Defendant Smith again vouched for Ralph Hernandez's parenting abilities and discounted or omitted information from other sources indicating that the children were in jeopardy. Defendants Dagones and Robbins then used Defendant Smith's reports to justify relinquishing CYFD's legal and physical custody of the Hernandez children to Ralph Hernandez. On the request of Defendants Dagones and Robbins, the children's court granted Mr. Hernandez both legal and physical custody of the children in an order dated October 14, 1992. (Compl. ¶¶ 45-52.)

Beginning in February 1993, Defendants Dagones and Robbins and other CYFD supervisors or social workers (John Does 4 and 5 or Jane Does 4 and 5) received additional reports that one or more of the Hernandez children were being subjected to further physical and sexual abuse. In addition, Ralph Hernandez was arrested on charges of being a felon in possession of a firearm. In response to this information, CYFD personnel took no action, and/or ratified their subordinate's inaction, until November 23, 1993, when the Hernandez children were finally removed from Mr. Hernandez's home in response to a report of sexual abuse. Ralph Hernandez was subsequently convicted of criminal sexual penetration in the first degree and sentenced to nineteen years in the penitentiary. (Compl. ¶¶ 53-57.)

## II.   ANALYSIS

### A.   Standard of Review

When, as here, a defense of qualified immunity is raised in a pretrial motion, this Court must exercise its discretion in applying the Federal Rules of Civil Procedure so as to

protect the substance of that defense.  The Court may do so by requiring Plaintiffs' pleadings to set forth specific, nonconclusory factual allegations in order to survive a dispositive pretrial motion, and by refraining from burdensome discovery or trial proceedings unless and until such pretrial motions have been resolved in Plaintiffs' favor. These procedural rules, however, do not impose a heightened pleading requirement in this context.  See Crawford-El v. Britton, 523 U.S. 574, 594-600 (1998); Currier v. Dolan, 242 F.3d 905, 915 (10th Cir. 2001).  Rather, the Court applies the "customary motion to dismiss standard."  Currier, 242 F.3d at 917.

Dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) is appropriate only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir.1997) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir.1991).  Accordingly, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party. GFF Corp., 130 F.3d at 1384.

**B.    Absolute Immunity**

Defendants Dagones and Robbins contend that the claims asserted against them in Count I of the *Third Amended Complaint* must be dismissed under the doctrine of absolute

-10-

immunity.  Absolute immunity is "strictly construed" based on consideration of "the history of common law immunity."  Snell v. Tunnell, 920 F.2d 673,  686, 691 (10th Cir. 1990).  The Court is not at liberty to expand the scope of this form of immunity based on public-policy considerations because courts "do not function as a legislature in enacting immunity grounds."  Id. at 691.

"In determining whether particular acts of government officials are eligible for absolute immunity," the Court applies "'a functional approach . . . which looks to the nature of the function performed, not the identity of the actor who performed it.'"  Malik v. Arapahoe County Dep't of Soc. Servs., 191 F.3d 1306, 1314 (10th Cir. 1999) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 269 (10th Cir. 1993)); accord Snell, 920 F.2d at 687. Functions which are traditionally afforded absolute immunity under this approach include those of a "judge acting in his judicial capacity," activities of a prosecutor that are "'intimately associated with the judicial process,' such as initiating and pursuing a criminal prosecution," and the testimony of witnesses in a judicial proceeding.  Snell, 920 F.2d at 686 (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)).  Thus, inasmuch as a social worker employed by a state agency functions as a witness or prosecutor in a manner that is intimately associated with a court proceeding, he or she may be entitled to absolute immunity.  See id.

"The more distant a function is from the judicial process, the less likely absolute immunity will attach."  Snell, 920 F.2d at 687.  In accordance with this principle, absolute immunity does not extend to functions performed by a state social worker that are more

analogous to the investigative or administrative work of a law enforcement officer.  <u>See</u>
<u>Malik</u>, 191 F.3d at 1314.  Such functions include "investigating claims of child abuse," <u>Snell</u>,
920 F.2d at 691, and "collaborative work in creating a 'plan of action'" regarding such
claims, <u>Malik</u>, 191 F.3d at 1314, especially where the social worker's duties are normally
limited to "report[ing] findings of neglect or abuse . . . to other authorities for further
investigation or advocacy in the form of initiation of court proceedings," <u>Snell</u>, 920 F.2d  at
690.

In this case, the *Third Amended Complaint* alleges some conduct on the part of
Defendants Dagones and Robbins that could involve testifying before a state children's court
in legal proceedings regarding the transfer of physical and legal custody of the Hernandez
children to their abusive biological father.  Under the authorities cited above, Defendants
Dagones and Robbins are entitled to absolute immunity with respect to their function as
witnesses in such proceedings.  The precise scope of this immunity, however, cannot be
determined based upon the pleadings alone.

Viewing the *Third Amended Complaint* in the light most favorable to Plaintiffs, as the
Court is required to do in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the
allegations against Defendants Dagones and Robbins also involve conduct that exceeds the
role of a prosecutor or witness in a court proceeding and is better analogized to the
investigative or administrative functions of a law enforcement officer.  In particular, the
*Third Amended Complaint* alleges that these Defendants supervised and took part in flawed
investigative and collaborative work regarding the monitoring of the Hernandez children and

the creation of a plan of action for returning them to their biological father's custody.

Further, like the statutory scheme at issue in <u>Snell</u>, 920 F.2d at 691-92, the relevant provisions of New Mexico's Children's Code contemplated that child abuse and neglect proceedings would be prosecuted by a children's court attorney rather than a CYFD supervisor or social worker, who is not a lawyer. <u>See</u> N.M. Stat. Ann. §§ 32-1-5(C), 32-1-14(H) (Michie 1978 & Supp. 1984) (repealed 1993). Thus, Defendants Dagones and Robbins alleged role in the Hernandez children's case was not functionally equivalent to that of a prosecutor. Even assuming that Defendants Dagones and Robbins had the authority to perform some prosecutorial functions in this case, the fact remains that they stand accused of *entirely failing* to take action to prosecute known instances of child abuse rather than being overzealous in such prosecutions. In this respect, their claims for absolute immunity are weaker than those presented in <u>Snell</u> and <u>Malik</u>. Accordingly, the Court concludes that the doctrine of absolute immunity does not provide sufficient grounds for dismissing (in their entirety) the claims asserted against Defendants Dagones and Robbins in Count I of the *Third Amended Complaint* at this time.

### C.   <u>Qualified Immunity</u>

42 U.S.C. § 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Persons sued in their individual capacity under this federal civil-rights statute generally are entitled to qualified immunity unless it is shown that their actions violated a specific statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue.  See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

### 1.    Substantive Due Process

The constitutional right at issue in Count I of Plaintiff's *Third Amended Complaint* is the substantive component of the Fourteenth Amendment's Due Process Clause.  This constitutional right also forms the primary basis for the theory of supervisory liability alleged in Count III of the *Third Amended Complaint*.

The Due Process Clause "generally confer[s] no affirmative right to governmental aid, even when such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196 (1989).  There are, however, two relevant exceptions to this general rule.  First, "state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm."  Seamons v. Snow, 84 F.3d 1226, 1236 (10th Cir. 1996) (quoting Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995)).  Second, "if the state restrains an individual's freedom to act to protect himself or herself

through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others." Armijo v. Wagon Mound Pub. Schs., 159 F.3d 1253, 1261 (10th Cir. 1998). In order to determine whether Defendants are entitled to qualified immunity as to Counts I and III of the *Third Amended Complaint*, the Court must first analyze whether Plaintiffs have stated a claim under either one of these theories.

### a.   Danger Creation Theory

The contours of a "danger creation" cause of action under the Due Process Clause are well-established in the Tenth Circuit. See Ruiz v. McDonnell, 299 F.3d 1173, 1182-83 (10th Cir. 2002); Currier, 242 F.3d at 918; Armijo, 159 F.3d at 1262-63.

> To make out a proper danger creation claim, a plaintiff must demonstrate that (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

Currier, 242 F.3d at 918. In essence, the danger-creation theory "focuses on the affirmative actions of the state in placing the plaintiff in harm's way." Id. at 919. Thus, it is not sufficient to claim that a state actor passively allowed the *status quo* to persist or failed to come to the rescue *after* an individual was placed in harm's way. Rather, a plaintiff must establish that a state actor actively changed the *status quo* by causing the plaintiff to be put in a position where he or she was more vulnerable to the alleged harm.

The affirmative conduct required to state a claim under the "danger creation" theory "should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration." Ruiz, 299 F.3d at 1183. Such "conduct should be directed at a discrete plaintiff rather than at the public at large." Id. Thus, state action which presents "a threat of indefinite range and duration" and does not, in and of itself, directly place an individual in danger generally cannot form the basis for a "danger creation" cause of action. Id.

In the context of social work involving abused children, the elements of such a cause of action generally may be satisfied by showing that the State placed a child in the physical or legal custody of an abuser based on a recommendation or other action by a state social worker that reflects a reckless and conscious disregard of an obvious or known substantial risk of serious, immediate, and proximate harm. Such a conscious disregard may arise from a failure to investigate allegations of abuse or from a deliberate effort to conceal or prevent others from reporting or providing aid in response to evidence of such abuse. See Currier, 242 F.3d at 919-22. When a supervisor has knowledge that a subordinate is depriving an abused child of his or her constitutional right to substantive due process in this manner and fails to intervene, that supervisor also may be liable for the violation of the child's constitutional right. See id. at 922-23.

### i.   Defendants Smith, Dagones, and Robbins

Applying these standards, Plaintiffs' *Third Amended Complaint* states a viable danger-creation claim against Defendants Robbins, Dagones, and Smith. With respect to these

Defendants, this is not a case like <u>DeShaney</u>, 489 U.S. at 201, where the State placed a child "in no worse position than that in which he would have been had it not acted at all." Before these Defendants acted in this case, the five sons of Dora and Ralph Hernandez were in the custody of both of their biological parents, and Christina Hernandez was not yet born. After their intervention, the five Hernandez sons were left in the sole custody of their biological father, and the custody of Christina Hernandez was transferred from her biological mother to her biological father, who then abused her and her siblings.

The affirmative acts which endangered the Hernandez children or increased their vulnerability relate to the delivery of the children to the sole physical custody of their biological father between May 1991 and August 1991, and the transfer of legal custody of the children to the children's father in October 1992. According to the allegations in the *Third Amended Complaint*, which the Court accepts as true for purposes of analyzing the pending motions to dismiss under Fed. R. Civ. P. 12(b)(6), Defendants Robbins and Dagones played an active role in bringing about the delivery of the children to the physical custody of their father between May and August 1991, as well as devising and implementing the plan to transfer legal custody of the children to Mr. Hernandez, which was accomplished in October 1992.

The *Third Amended Complaint* does not allege that Defendant Smith played an active role in the Hernandez children's case until after they were placed in the physical custody of Ralph Hernandez. Thus, Defendant Smith did not create the danger alleged in this case. Nevertheless, the *Third Amended Complaint* satisfies the first element of the "danger

creation" cause of action with respect to Defendant Smith because his alleged actions increased the children's vulnerability to that danger. See Currier, 242 F.3d at 918; Ruiz, 299 F.3d at 1185. In particular, it is alleged that Defendant Smith's flawed investigation and reporting during the period prior to the transfer of legal custody in October 1992 played a significant role in bringing about that transfer, which in turn increased the children's vulnerability to Mr. Hernandez's abuse.

The allegations in the *Third Amended Complaint* also are sufficient to satisfy the other elements of a "danger creation" cause of action for the purpose of defeating the motions to dismiss filed by Defendants Smith, Dagones, and Robbins. As in Currier, 242 F.3d at 920, the children at issue here are members of a limited and specifically definable group, namely "children the state has removed from their natural parent[s] and taken into state custody."

Based on Plaintiffs' allegations regarding Mr. Hernandez's past abuses, the opinion of the psychologist who evaluated him, and the reports that he had relapsed into substance abuse, it is reasonable to infer that the risk of harm to the Hernandez children at the time of the aforementioned actions of Defendants Smith, Dagones, and Robbins was serious, immediate, proximate, obvious, and known. See id. at 918. In this regard, the allegations in the *Third Amended Complaint* go beyond the risks associated with an isolated instance of corporal punishment or relatively minor physical neglect resulting in an unkempt appearance. Rather, the risk alleged here involves an individual who had previously beaten and shot at his pregnant spouse in the presence of his children, and who was to serve as the children's primary caregiver despite having relapsed into substance abuse. Almost immediately after

-18-

delivering the children to the physical custody of this individual, CYFD personnel allegedly were notified of additional risks encompassing repeated physical abuse of the children as well as sexual victimization of the youngest and only remaining female family member.

The allegations in the *Third Amended Complaint* also give rise to a reasonable inference that Defendants Dagones, Smith, and Robbins acted recklessly in conscious regard of the risk that Mr. Hernandez would abuse the children when they were placed in his physical custody, or that he would further abuse the children when they were placed in his legal custody.  In this regard, the *Third Amended Complaint* contains numerous allegations that Defendants Robbins, Dagones, and Smith persisted in their efforts to place the children in the physical and legal custody of their biological father despite their knowledge, based on first-hand observations or reports from credible sources, that the children were being abused and that their biological father was unfit to parent them.

It is possible that the conduct alleged here, if proven at trial, might not be considered as shocking to the conscience as the conduct alleged in Currier, 242 F.3d at 910, which resulted in a child being killed after his father poured boiling water on him, or in Armijo, 159 F.3d at 1256-58, which resulted in a despondent special-education student committing suicide after he was sent home from school without his parent's knowledge.  But the difference between this case and those two cases is a difference in degree and not a difference in kind.  State action resulting in physical or sexual abuse of a child need not result in the child's death in order to shock the conscience.  See, e.g., Sutton v. Utah State Sch. for the Deaf and Blind, 173 F.3d 1226, 1239-42 (10th Cir. 1999) (sexual abuse); Garcia

v. Miera, 817 F.2d 650, 653 (10th Cir. 1987) (physical abuse).  Accordingly, the Court concludes that "the cumulative impression" of the conduct alleged here "could be 'construed as conscience-shocking, depending on the context as determined after a full trial.'"  Currier, 242 F.3d at 920 (quoting Armijo, 159 F.3d at 1264).

Having determined that the allegations in the *Third Amended Complaint*, if true, would be sufficient to establish a violation of the Hernandez children's constitutional rights by Defendants Smith, Dagones, and Robbins under a "danger creation" theory, the Court next addresses whether these Defendants are entitled to qualified immunity on the grounds that the law regarding this theory was not clearly established at the time of their actions in 1991 and 1992.  The starting point for the analysis of this issue is DeShaney, 489 U.S. at 197-201, which held in 1989 that "state officials could not be liable for failing to protect citizens from private violence," where "the state had played no part in creating the danger or leaving the plaintiff more vulnerable to the danger."  Currier, 242 F.3d at 923.  According to the Tenth Circuit, the clear implication of the DeShaney opinion "was that a state could be liable when it affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence."  Id.

Although it is arguable that the Tenth Circuit did not fully recognize the "danger creation theory" until 1992, see Medina, 960 F.2d at 1496, other circuits recognized this theory prior to that year, see, e.g., McComb v. Wambaugh, 934 F.2d 474, 483 (3d Cir. 1991); Freeman v. Ferguson, 911 F.2d  52, 55 (8th Cir. 1990); Ross v. United States, 910 F.2d 1422, 1431 (7th Cir. 1990).  Further, Plaintiffs' allegations against Defendants Smith,

Dagones, and Robbins represent "a relatively straightforward application" of the "danger creation" doctrine and do not rest on the more novel proposition that a state actor can be liable for instructing another individual "to stop making allegations of abuse."  Currier, 242 F.3d at 921, 925.  Accordingly, based on Supreme Court precedent in DeShaney and the weight of authority in other circuits, this Court concludes that the "danger creation" theory was sufficiently established in 1991 and 1992 to make clear to a reasonable official that the conduct alleged here violated the children's constitutional right to substantive due process under that theory.  See Currier, 245 F.3d at 923-24.  It follows that the motions to dismiss filed by Defendants Smith, Dagones, and Robbins must be denied in part as to the "danger creation" theory alleged in Count I, and relied upon (with respect to the supervisory liability of Defendants Dagones and Robbins) in Count III of the *Third Amended Complaint*.

### ii.   **Defendants Rapp and Barela**

The Court reaches a different conclusion with respect to Defendants Rapp and Barela. Count I of Plaintiffs' *Third Amended Complaint* does not meet the first element of a "danger creation" cause of action against Defendants Rapp and Barela because these individuals are not alleged to have engaged in "affirmative conduct" which directly placed the Hernandez children in the physical or legal custody of their abusive biological father during these Defendants' tenure as the children's CYFD case workers.  Currier, 242 F.3d at 919; see Sutton, 173 F.3d at 1239 (dismissing a danger-creation claim against an individual who "did not personally, affirmatively place [the child] in any danger").

-21-

Although the work of Defendants Rapp and Barela preceded Ralph Hernandez's physical and legal custody of the children, these Defendants' failure to pursue termination of parental rights and adoption in lieu of reunification of the Hernandez family in 1989 and 1990 "did not impose an immediate threat of harm" to the children, Ruiz, 299 F.3d at 1183, as they remained in the custody of the State during that period and Mr. Hernandez remained incarcerated during most of that period.  The threat presented by the acts and omissions of Defendants Rapp and Barela during 1989 and 1990 was "of an indefinite range and duration."  Id.  Accordingly, it cannot form the basis for a "danger creation" cause of action against these Defendants.

For the purpose of establishing an ordinary negligence claim, it may be true that the alleged failure of Defendants Rapp and Barela to pursue termination of parental rights and adoption was a "but for" cause of the children's eventual placement with their abusive biological father.  But these allegations do not suffice to establish a substantive due-process claim against Defendants Rapp and Barela under 42 U.S.C. § 1983 because "ordinary negligence does not shock the conscience."  Ruiz, 299 F.3d at 1184.

Finally, even if the Court were to find that Plaintiffs had stated a "danger creation" cause of action against Defendants Rapp and Barela, these Defendants are entitled to qualified immunity in this case because the variation of the "danger creation" theory alleged against these Defendants was not sufficiently established in 1989 and 1990 to make it clear to a reasonable official that their conduct violated a child's constitutional right under that theory.  See Currier, 242 F.3d at 923.  The DeShaney case was not decided until 1989, and

the implications of DeShaney were not sufficiently developed in the circuit courts to conclude that the relatively novel variation on that theory alleged with respect to Defendants Rapp and Barela was well established by 1989 or 1990. See Currier, 242 F.3d at 925. This conclusion is reinforced by the Tenth Circuit's subsequent opinion in Ruiz, 299 F.3d at 1183-84, which specifically declined to extend the "danger creation" theory to cover state action which poses an indefinite rather than immediate threat of harm. For these reasons, Defendants Rapp and Barela are entitled to qualified immunity with respect to the "danger creation" theory alleged in Count I of Plaintiffs' *Third Amended Complaint*.

### b.      **Special Relationship Theory**

Counts I and III of the *Third Amended Complaint* also rely on a "special relationship" theory to support Plaintiffs' substantive due-process claims. This theory is premised on "'the State's affirmative act of restraining the individual's freedom to act on his own behalf-- through incarceration, institutionalization, or other similar restraint of personal liberty.'" Armijo, 159 F.3d at 1261 (quoting DeShaney, 489 U.S. at 200). Defendants Rapp, Barela, Smith, Dagones, and Robbins contend that such an affirmative act is lacking in this case because CYFD did not have physical custody of the Hernandez children at the time they were abused by their biological father in 1991. In response to this contention, Plaintiffs point out that CYFD retained legal custody of the Hernandez children during part of the time they were abused by their biological father.

The Court determines that Plaintiffs' allegations regarding CYFD's relationship with the Hernandez children at the time they were abused by their biological father are not

sufficient to state a claim under the "special relationship" theory recognized by the Tenth Circuit in Armijo, 159 F.3d at 1261.  The Tenth Circuit authority on which Plaintiff primarily relies to support this theory is inapposite because it involved children who were involuntarily placed in foster homes or in a boarding school that also served as a correctional and detention facility at the time of the alleged abuse.  See Yvonne L. v. N.M. Dep't of Human Servs., 959 F.2d 883, 891-93 (10th Cir. 1992) (foster care); Milonas v. Williams, 691 F.2d 931, 935, 942 (10th Cir. 1982) (boarding school that also served as a "correctional and detention facility").  Foster homes and reform schools bear a more obvious analogy to penal or mental-health institutions, in which a special relationship of constitutional proportions arises from the fact that individuals involuntarily held therein are wholly dependent on the state-run institution for their basic needs, such as food, clothing, shelter, medical care, and reasonable safety.  See generally DeShaney, 489 U.S. at 199-200 (citing Youngberg v. Romero, 457 U.S. 307 (1982) (state mental institution), and Estelle v. Gamble, 429 U.S. 97 (1976) (state penal institution)).

A different situation is presented by relinquishing the physical custody of a child to a parent whose biological relationship and legal rights with respect to that child precede any intervention by the State on the child's behalf.  In this situation, the fact that the State retains legal custody of the child is not sufficient to establish a "special relationship" for purposes of asserting a claim under the substantive component of the Due Process Clause.  Legal custody without day-to-day physical control of a child's ability to satisfy his or her basic needs is more akin to the mere undertaking or proclamation of intent to protect a child, which

the Supreme Court found insufficient to establish such a special relationship in <u>DeShaney</u>,
489 U.S. at 197-98, or to the limited custodial responsibilities imposed by state compulsory
school-attendance statutes, which the Tenth Circuit found insufficient to establish such a
relationship in <u>Maldonado v. Josey</u>, 975 F.2d 727, 732-33 (10th Cir. 1992), <u>Seamons</u>, 84
F.3d at 1235-36, and <u>Armijo</u>, 159 F.3d at 1261-62.

To be sure, state courts and legislative bodies are free to impose tort liability on a state
agency based on that agency's undertaking to protect a child or its statutory responsibilities
with respect to a child.  <u>See</u> <u>DeShaney</u>, 489 U.S. at 201-02.  But the definition of a "special
relationship" within the meaning of a state statute or common law imposing such tort liability
is not necessarily equivalent to a "special relationship" within the meaning of the substantive
component of the Due Process Clause.  <u>See</u> <u>id.</u>  "[T]he Due Process Clause of the
Fourteenth Amendment . . . does not transform every tort committed by a state actor into a
constitutional violation."  <u>Id.</u> at 202.

The Eleventh Circuit employed similar reasoning when it dismissed a substantive due-
process claim under circumstances "where a public agency is awarded legal custody of a
child, but does not control that child's physical custody except to arrange court-ordered
visitation with the non-custodial parent."  <u>Wooten v. Campbell</u>, 49 F.3d 696, 699 (11th Cir.
1995).  In particular, the Eleventh Circuit rejected the analogy to a foster-care situation and
instead analogized the situation of private physical custody and state legal custody to the
circumstances presented in <u>DeShaney</u> and <u>Maldonado</u>.  <u>See</u> <u>Wooten</u>, 49 F.3d at 699-701.
The Court finds this reasoning persuasive and, therefore, concludes that Plaintiffs' *Third*

*Amended Complaint* fails to state a viable substantive due-process claim against Defendants Rapp, Barela, Smith, Dagones, and Robbins under a "special relationship" theory.

Even assuming that the Hernandez children's substantive due-process rights were violated in this case by virtue of such a special relationship, Defendants Rapp, Barela, Smith, Dagones, and Robbins are entitled to qualified immunity on this claim because this theory was not sufficiently well-established in the 1989-1992 time frame to make clear to a reasonable official that the conduct alleged here violated the children's constitutional right to substantive due process under that theory.  See Currier, 245 F.3d at 923-24.  In this regard, DeShaney does not clearly imply such a broad extension of the "special relationship" theory, and the primary Tenth Circuit authority upon which Plaintiffs rely for this theory was not decided until March 24, 1992.  See Yvonne L., 959 F.2d at 883.  Further, the Tenth Circuit placed clear limitations on the scope of the "special relationship" theory when it decided Maldonado, 975 F.2d at 727, on September 16, 1992.  Those limits have been applied consistently in subsequent Tenth Circuit opinions.  See Seamons, 84 F.3d at 1235-36; Armijo, 159 F.3d at 1261-62.  For these reasons, the motions to dismiss filed by Defendants Rapp, Barela, Smith, Dagones, and Robbins must be granted in part as to the "special relationship" theory alleged in Count I and relied upon (with respect to the supervisory liability of Defendants Dagones and Robbins) in Count III of the *Third Amended Complaint*.

### 2.   <u>Adoption Assistance and Child Welfare Act</u>

Count II of Plaintiffs' *Third Amended Complaint* asserts that Defendants are liable

for violating a provision of the Adoption Assistance and Child Welfare Act (AACWA), 42

U.S.C. § 671(a)(9).  As amended in 1990, this provision states, in relevant part, that:

> In order for a State to be eligible for payments under this part, it shall
> have a plan approved by the Secretary which–
>
> . . .
>
> (9) provides that the State agency will–
>
> (A) report to an appropriate agency or official, known or suspected
> instances of physical or mental injury, sexual abuse or exploitation, or
> negligent treatment or maltreatment of a child receiving aid under part B of
> this subchapter or this part under circumstances which indicate that the child's
> health or welfare is threatened thereby; and
>
> (B) provide such information with respect to a situation described in
> subparagraph (A) as the State agency may have[.]

42 U.S.C. § 671(a)(9) (as amended in 1990).

The alleged conduct of Defendants Rapp and Barela preceded the effective date of the

1990 amendment to 42 U.S.C. § 671(a)(9).  In response to the motions to dismiss filed by

Defendants Rapp and Barela, Plaintiffs concede that they are not asserting AACWA claims

against these two Defendants in Count II of the *Third Amended Complaint*.  (Pltfs.' Resp.

to Def. Barela's Mot. to Dismiss at 20-21; Pltfs.' Resp. to Def. Rapp's Mot. to Dismiss at

13-14.)  Thus, the Court limits its analysis of the AACWA claims in Count II to Defendants

Smith, Dagones, and Robbins.

Plaintiffs primarily rely on unpublished district court opinions to support their assertion that they have a cause of action under 42 U.S.C. § 671(a)(9) that is enforceable by means of 42 U.S.C. § 1983. See Bailey v. Pacheco, Civ. No. 96-959 LH/DJS (D.N.M. Apr. 3, 1998); Pearcy v. Douglas, Civ. No. 95-307 BB/DJS (D.N.M. Oct. 2, 1996). Defendants point out that in the Bailey case, the district court later concluded that some defendants were entitled to qualified immunity because the law regarding this statutory provision was not well-established in mid-1995. See Bailey v. Pacheco, Civ. No. 96-959 LH/DJS (D.N.M. Apr. 6, 2000). Defendants also point out that the district court did not have occasion to rule on this issue in the Pearcy case because the defense of qualified immunity was not raised.

The development of the law since the Bailey and Pearcy opinions were issued does not support the conclusion that Section 671(a)(9) of AACWA affords Plaintiffs a well-established private right of action with regard to the alleged conduct of Defendants Smith, Dagones, and Robbins in the 1991-1993 time frame. See Daniel H. v. City of New York, 115 F. Supp. 2d 423, 427-28 (S.D.N.Y. 2000); Charlie H. v. Whitman, 83 F. Supp. 2d 476, 484-94 (D.N.J. 2000). The Supreme Court recently clarified its jurisprudence in this area in Gonzaga Univ. v. Doe, 122 S. Ct. 2268 (2002). The Gonzaga Court "reject[ed] the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action under § 1983," as well as "the notion that our implied right of action cases are separate and distinct from our § 1983 cases." Id. at 2275. Under this framework, spending legislation may give rise to enforceable rights only in rare instances. See id. at 2273.

-28-

In light of the authority cited above, the Court concludes that 42 U.S.C. § 671(a)(9) does not confer a private right of action that can be enforced for purposes of obtaining monetary damages under 42 U.S.C. § 1983. In addition, Defendants are entitled to qualified immunity with respect to such an action because any rights established by the 1990 amendment to 42 U.S.C. § 671(a)(9) were not clearly established during the 1991-1993 time frame that is the subject of the pertinent allegations here. For these reasons, Plaintiffs' AACWA claims asserted against Defendants Rapp, Barela, Smith, Dagones, and Robbins in Count II of the *Third Amended Complaint* must be dismissed.

### 3. Procedural Due Process

In Count IV of the *Third Amended Complaint*, Plaintiffs allege that a provision of the State of New Mexico's Children's Code, N.M. Stat. Ann. § 32-1-38.1(F) (repealed 1993), imposed a duty on Defendants Rapp, Barela, Dagones, and Robbins to initiate proceedings to terminate parental rights or seek permanent guardianship after the Hernandez children had been in the custody of CYFD for more than eighteen months. Plaintiffs further allege that by imposing this duty, the statute endowed the Hernandez children with a constitutionally protected liberty interest in the timely initiation of such proceedings. According to Plaintiffs, Defendants Rapp, Barela, Dagones, and Robbins violated the children's constitutional right to procedural due process and access to the courts under the Fourteenth Amendment to the United States Constitution by failing to afford the process that was due regarding the initiation of such proceedings after the children had been in the custody of CYFD for more than eighteen months.

The provisions of the Children's Code at issue here provided, in relevant part, that:

     A.    Within six months of any original dispositional order and within six months of any subsequent continuation of the order, the human services department shall petition the court for a review of the disposition of an adjudicated neglected or abused child . . . entered pursuant to the Children's Code. . . .  The review may be carried out by . . . a judicial review hearing conducted by the court. . . .

     . . .

     C.    At any judicial review hearing . . . the human services department and all persons given notice . . . shall have the opportunity to present evidence and to cross-examine witnesses.  At the hearing, the human services department shall not only show that it has made a reasonable effort to implement any treatment plan approved by the court in its dispositional order but shall also present a treatment plan for any period of extension of the dispositional order.  The parent, guardian or custodian of the child shall demonstrate to the court that his effort to comply with the treatment plan approved by the court in its dispositional order and his effort to maintain contact with the child was diligent and made in good faith, given his circumstances and abilities.

     . . .

     E.    At the conclusion of any hearing held pursuant to this section, the court shall make findings of fact and conclusions of law.

     F.    Based on its findings, the court shall order one of the following dispositions:

     . . .

     (6)    if the child has been in substitute care, including residential care, for a period of eighteen months or longer and the child cannot be returned to his parents, initiate termination of parental rights or permanent guardianship proceedings, unless there has been an affirmative showing that because of age or health the possibility of permanent placement is remote.

N.M. Stat. Ann. § 32-1-38.1 (repealed 1993).  The Children's Code was completely revised in 1993, and the revised provision regarding periodic review of dispositional judgments no longer contains the language in former Section 32-1-38.1(F)(6) regarding initiation of termination of parental rights after an eighteen-month period.  <u>See</u> N.M. Stat. Ann. § 32A-4-25 (Michie 1978 & Supp. 1999).  In 2001, a provision in the revised Children's Code was amended to include language requiring CYFD to file a motion to terminate parental rights "[w]hen a child has been in the custody of the department for not less than fifteen of the previous twenty-two months," unless one or more of eight specific conditions are met.  <u>See</u> N.M. Stat. Ann. § 32A-4-29(K) (Michie 1978 & Supp. 2002).  Plaintiffs do not allege that Defendants violated their duties with respect to the Hernandez children under the revised version of the Children's Code that took effect in 1993 or any subsequent amendment to the Children's Code.  Accordingly, the Court limits its analysis to the provisions that were repealed in 1993.

While the violation of a duty imposed by state law is not itself sufficient to state a claim upon which relief may be granted under 42 U.S.C. § 1983, it is well established that "[s]tates may under certain circumstances create liberty interests which are protected by the Due Process Clause" and which, consequently, may establish the grounds for a federal civil-rights action.  <u>Sandin v. Conner</u>, 515 U.S. 472, 483-84 (1995).  To determine whether a particular state statute creates such a liberty interest, the Supreme Court traditionally looks to "whether the State ha[s] gone beyond issuing mere procedural guidelines and ha[s] used 'language of an unmistakably mandatory character' such that the incursion on liberty would

not occur 'absent specified substantive predicates.'"   Id. at 480 (quoting Hewitt v. Helms,

459 U.S. 460, 471-72 (1983)).  If the statute contains such unmistakably mandatory language

creating a liberty interest, then the negative inference may be drawn that such an interest

cannot be infringed without affording the requisite level of procedural protections afforded

by the Due Process Clause.  See id. at 481-82.

The Supreme Court has recently indicated that this method of determining whether

a state statute creates a constitutionally protected liberty interest no longer applies in the

context of challenges to prison regulations.   See id. at 483-84.   The Supreme Court

articulated a number of reasons why it is not sensible to apply the methodology described

above in the context of prison regulations, but also noted that this method may remain

"entirely sensible in the ordinary task of construing a statute defining rights and remedies

available to the general public."   Id. at 481.

Applying the traditional methodology applicable to the ordinary task of construing a

statute defining rights and remedies available to the general public, the Court concludes that

N.M. Stat. Ann. § 32-1-38.1(F) did not endow the Hernandez children with a constitutionally

protected liberty interest in having the parental rights of Ralph and Dora Hernandez

terminated, or having termination proceedings initiated, based on the fact that the children

had been in the custody of CYFD for more than eighteen months.  During the 1989-1992

time frame, the statute at issue here only imposed a duty upon CYFD (or its predecessor, the

Human Services Department) to "petition the court for a review of the disposition of an

adjudicated neglected or abused child" at six-month intervals, N.M. Stat. Ann. § 32-1-

38.1(A), and to present certain information to the court at a judicial review hearing, id. § 32-1-38.1(C).  Under this statutory scheme, the necessity of initiating proceedings to terminate parental rights depended on what information CYFD presented to the children's court at such hearings, what information the child's parent, guardian, or custodian presented at such hearings, and what findings the children's court made based on that information pursuant to § 32-1-38.1(E).  Further, the statute did not require the automatic initiation of termination proceedings based solely upon a finding that the eighteen-month deadline had expired.  Rather, the children's court first had to find that "the child cannot be returned to his parents," and that there was no "affirmative showing that because of age or health the possibility of permanent placement is remote."  Id. § 32-1-38.2(F).

Given all these conditions and prerequisites, this Court determines that the type of "language of an unmistakably mandatory character" necessary to create a constitutionally protected liberty interest in the termination of parental rights, or the initiation of termination proceedings, is absent from the statute upon which Plaintiffs rely in this case.  Hewitt, 459 U.S. at 471.  The Court further determines that the *Third Amended Complaint* fails to allege any of the other "specified substantive predicates" besides the passage of eighteen months that are necessary to trigger the duty to initiate such termination proceedings.  Id. at 472.  In particular, Plaintiffs do not allege that CYFD failed to petition for judicial review hearings at the required six-month intervals during the relevant time period, or that there exists a court order containing all of the specific findings necessary to trigger the duty to initiate termination proceedings under § 32-1-38.1(F).

In addition, there are reasons similar to those expressed in Sandin, 515 U.S. at 482-84, why it may not be entirely sensible to use federal civil-rights litigation as a mechanism for "combing" the State of New Mexico's Children's Code in search of mandatory language on which to establish a child's liberty interest in the initiation of proceedings to terminate parental rights.  One of these reasons is that such litigation may interfere with the functioning of the State's children's court in a manner that "run[s] counter to the view expressed in several ... cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment."  Id. at 482; see also Joseph A., 275 F.3d at 1267-72 (explaining why federal courts are required to abstain from interference with state children's court proceedings under the Younger doctrine).  Another reason is that the decision to initiate proceedings to terminate parental rights involves a degree of prosecutorial discretion that may implicate the doctrine of absolute immunity discussed in Section II.B above.  See Snell, 920 F.2d at 686-87.  A third reason is that the parents who are the subject of termination proceedings have well-established constitutional rights with respect to those proceedings.  See, e.g., Santosky v. Kramer, 455 U.S. 745, 753-54 (1982).

For these reasons, the children's interest in permanent placement needs to be balanced against the parents' rights to a fair hearing and the state judicial system's need to perform its function without the threat of retaliatory litigation under federal civil-rights statutes.  A construction of the statute that affords sufficient leeway for a reasoned exercise of prosecutorial discretion and judicial review in state court before termination proceedings are initiated is more conducive to achieving this balance than a construction that imposes a

-34-

mechanical, non-discretionary, and unilateral duty upon CYFD or the children's court attorney to initiate termination proceedings automatically upon the expiration of an eighteen-month time period.  The Court declines to adopt a construction of Section 32-1-38.1(F) that would preclude such a reasoned exercise by requiring CYFD to unilaterally and mechanically initiate termination proceedings on a certain date based solely on the expiration of an eighteen-month time period.

Finally, even assuming that Section 32-1-38.1(F) of the Children's Code could be interpreted in the manner advanced by Plaintiffs in this case, Plaintiffs have failed to show that such an interpretation was sufficiently well-established in the 1989-1992 time frame to make clear to a reasonable official that the conduct alleged here violated the children's constitutional right to procedural due process.  See generally Currier, 242 F.3d at 925.  Citing no precedent from the United States Supreme Court, the Tenth Circuit, or the New Mexico Supreme Court that is directly on point, Plaintiffs fall back on the argument that the statutory provision itself was so clearly established that Defendants reasonably would have known that it required them to initiate termination proceedings after the Hernandez children had been in the custody of CYFD for more than eighteen months.  This argument lacks merit.

As explained above, the language of the statutory provision at issue here sets forth a number of conditions and prerequisites, in addition to the eighteen-month deadline, which suggest that the initiation of termination proceedings under this provision must be predicated on specific findings by the children's court.  To reach the interpretation favored by Plaintiffs, one must disregard these other conditions and prerequisites and draw the contrary inference

-35-

that CYFD had a unilateral duty to act based solely on the eighteen-month deadline.  This interpretation is not plainly evident from the statutory language itself, nor was it well-established law in the 1989-1992 time frame.  It follows that Defendants Rapp, Barela, Dagones, and Robbins are entitled to qualified immunity with respect to Count IV of the *Third Amended Complaint*.

### 4.    Equal Protection

Count V of the *Third Amended Complaint* alleges that Defendants Smith, Dagones, and Robbins violated the Hernandez children's rights to equal protection under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1981(a).  In particular, Plaintiffs claim that Defendant Smith exhibited such discrimination when he dismissed others' concerns about the Hernandez family as "subjective inferences drawn from different values, norms, mores, or cultural biases[,] possibly even ego projected judgments," and when he ridiculed the views of the children's teachers and court-appointed special advocate as "value-laden assumptions originating from personal, but ethnocentric viewpoints." (3d Am. Compl. ¶¶ 34, 49, 93.)  Plaintiffs would have the factfinder infer from these statements that Defendant Smith treated the Hernandez family differently than similarly situated non-Hispanic families by disregarding or discounting Ralph Hernandez's abuse and neglect of the children on the ground that Mr. Hernandez's behavior was commonplace and fully acceptable within Hispanic families.

In addition to alleging racial discrimination, Count V of the *Third Amended Complaint* alludes to an alternative theory that Defendant Smith's alleged differential

treatment of the Hernandez family was "at least without any rational basis." (3d Am. Compl. ¶ 93.) Plaintiffs do not provide any support for this alternative theory in response to the motions to dismiss filed by Defendants Smith, Dagones, and Robbins, nor do they identify what allegedly impermissible classification this theory is based upon. Plaintiffs' response to the motion to dismiss filed by Defendants Dagones and Robbins also does not address these Defendants' argument that they are entitled to the dismissal of Plaintiffs' equal protection claims. Accordingly, the Court limits its analysis to Plaintiffs' racial discrimination claim against Defendant Smith.

Intentional discrimination based on an impermissible factor such as race or national origin (including Hispanic ancestry or ethnicity) can violate the Fourteenth Amendment's Equal Protection Clause and state a cause of action under 42 U.S.C. § 1983. See Ramirez v. Dep't of Corrections, 222 F.3d 1238, 1243 (10th Cir. 2000). Certain claims of racial discrimination also may be actionable under 42 U.S.C. § 1981(a), which provides, in relevant part, that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .

While this statute "on its face relates primarily to racial discrimination in the making and enforcement of contracts," Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 459-60 (1975), it may provide a remedy for racial discrimination in certain other contexts as well,

see, e.g., Ramirez, 222 F.3d at 1244 (applying 42 U.S.C. § 1981(a) in the context of employment discrimination).

In this case, Plaintiffs' equal protection claims fail for three reasons.  The first reason is that the allegations in the *Third Amended Complaint* are insufficient to give rise to a reasonable inference that Defendant Smith acted with a racially discriminatory purpose in applying the laws and policies regarding abused and neglected children contained in New Mexico's Children's Code.  In this regard, the Court notes that there are no specific allegations regarding how Defendant Smith treated other, non-Hispanic families that he investigated in his capacity as a CYFD supervisor or social worker, or whether he consistently applied his alleged philosophy of "maintaining biological family integrity" to those families.  In addition, there are no allegations that he made any racially derogatory remarks about Hispanic families or the acceptability of abusive conduct in such families.  Rather, the only specific allegation in this regard is that he accused other child-welfare workers of having a "cultural bias" or "ethnocentric viewpoint."

Taken in the context of the other allegations in the *Third Amended Complaint*, the reasonable inference to be drawn from these statements is not that Defendant Smith was exhibiting a racial bias against Hispanic families, but rather that he was accusing other child-welfare workers of doing so.  In particular, Defendant Smith's alleged statements indicate that he was concerned that the Hernandez children might be removed from their father's custody based on a culturally biased or ethnocentric view that, as a Hispanic parent, Mr. Hernandez was less capable of caring for his children than a non-Hispanic parent. In this

regard, Defendant Smith's statements appear to reflect the recognition that, in our nation's history, there have been invidious, racially motivated efforts by government agencies to remove children from their homes for the purpose of placing them with caregivers of a different ethnic or cultural background.  See, e.g., Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32-37 (1989) (explaining the concerns which led to the enactment of the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963); cf. N.M. Stat. Ann. § 32A-4-9 (Michie 1978 & Supp. 1999) (stating preferences for placement of Indian children).  But cf. 42 U.S.C. § 671(a)(18) (West Supp. 2002) (prohibiting denial of placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child involved).  While the allegations in the *Third Amended Complaint* suggest that Defendant Smith's judgment was profoundly mistaken in this case for other reasons, those allegations are not sufficient to establish that he intended to withhold protective services from the children based on a discriminatory animus toward Hispanic families.

In reaching this conclusion, the Court is mindful of the standard of review applicable to a motion to dismiss under Fed. R. Civ. P. 12(b)(6), which requires all of the allegations in the *Third Amended Complaint* to be viewed in the light most favorable to Plaintiffs at this point. This standard, however, does not mean that Plaintiffs can overcome a defense of qualified immunity simply by asserting conclusory allegations that do little more than "paraphrase the statute."  Olguin v. Lucero, 87 F.3d 401, 405 (10th Cir. 1996).

The second reason why Plaintiffs' equal protection claims fail in this case is that they have not shown that the law was clearly established in the specific context alleged here. Except for quoting the dictum in <u>DeShaney</u>, 489 U.S. at 197 n. 3, which noted that "[t]he State may not . . . selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause," Plaintiffs have not identified any authorities applying 42 U.S.C. § 1981(a) or the Equal Protection Clause in the child-welfare context alleged here.   It is Plaintiffs' burden to do so in order to show that the law on which these claims are premised was clearly established in this context during the 1991-1992 time frame when Defendant Smith was actively involved with the Hernandez family.  <u>See</u> <u>Currier</u>, 242 F.3d at 923.

To be sure, "the general notion that one cannot discriminate on the basis of race or national origin is undoubtedly clearly established." <u>Ramirez</u>, 222 F.3d at 1243-44 (internal quotation marks omitted).  It is also clearly established that an equal protection claim against a municipality can be premised on evidence that law enforcement officers "followed a policy or custom of affording less protection to victims of domestic violence than to victims of nondomestic attacks."  <u>Watson v. City of Kansas City</u>, 857 F.2d 690, 696 (10th Cir. 1988). Based on <u>Watson</u>, it is reasonable to expect law enforcement officials to draw the analogy that they would be acting unlawfully if they followed such a policy of discriminatory treatment towards victims of domestic violence who are children.  The application of this analogy to a social worker's consideration of race or gender issues relating to abused or neglected children is not entirely clear, however, because the Tenth Circuit's opinion in

Watson, 857 F.2d at 696-97, also concluded that the municipal defendant was entitled to summary judgment on the plaintiffs' gender-discrimination claim and that qualified immunity might be available to the individual defendants in that case notwithstanding a finding of municipal liability.  For these reasons, the Court is not persuaded that Watson clearly established the viability of the sort of equal protection claims Plaintiffs are attempting to raise in Count V of the *Third Amended Complaint* with regard to the 1991-1992 time frame.  Thus, Defendants Smith, Dagones, and Robbins are entitled to qualified immunity with respect to these claims.

Finally, the purpose of judicial review under the Equal Protection Clause is to determine whether there is a justification for making a classification between those who are subjected to some form of undesirable state action and those who are not.  In this case, the alleged state action is the creation of a danger, or increased vulnerability, that a child will be subjected to severe physical and sexual abuse.  The Court concludes that there is no justification for subjecting any child to such abuse based on any classification.  Accordingly, the appropriate inquiry in this case is not whether the children's rights to equal protection were violated, but whether their right to substantive due process was violated under the "danger creation" theory articulated in Count I of the *Third Amended Complaint*.

The Court concludes that Plaintiffs may proceed with their substantive due-process claims against Defendants Smith, Dagones, and Robbins on this "danger creation" theory, but that Plaintiffs' other claims, including their equal protection claims, must be dismissed. The reason for the dismissal of these other claims is not that the abusive and reckless conduct

alleged here was somehow excusable.  Rather, the basis for the dismissal of these claims is simply that Plaintiffs have attempted to apply the wrong legal theories to this conduct.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that Plaintiffs' *Third Amended Complaint* fails to state a claim against Defendants Rapp and Barela upon which relief may granted.  The Court further concludes that Plaintiffs' only viable claim against Defendants Smith, Dagones, and Robbins is the danger-creation theory concerning the Hernandez childrens' constitutional right to substantive due process alleged in Counts I and III of the *Third Amended Complaint*.

**IT IS, THEREFORE, ORDERED** that ***Defendant Smith's Motion to Dismiss Third Amended Complaint*** [Doc. No. 77] is **GRANTED IN PART** with respect to Counts II, V, and the "special relationship" theory alleged in Count I of the *Third Amended Complaint*, and **DENIED IN PART** with respect to the "danger creation" theory alleged in Count I of the *Third Amended Complaint*.

**IT IS FURTHER ORDERED** that ***Defendant Nicholas Dagones and Kelly Robbins' Motion to Dismiss Plaintiffs' Third Amended Complaint on Basis of Qualified Immunity and Absolute Immunity and Memorandum in Support Thereof*** [Doc. No. 82] is **GRANTED IN PART** with respect to Counts II, V, and the "special relationship" theory alleged or relied upon in Counts I and III of the *Third Amended Complaint*, and **DENIED**

**IN PART** with respect to the "danger creation" theory alleged or relied upon in Counts I and III of the *Third Amended Complaint*.

**IT IS FURTHER ORDERED** that *Defendant Norma Barela's Motion to Dismiss Third Amended Complaint (Counts I & II) and Memorandum in Support Thereof* [Doc. No. 85] is **GRANTED**.

**IT IS FURTHER ORDERED** that *Defendant Brenda Rapp's Motion to Dismiss Counts I & II of Plaintiffs' Third Amended Complaint on Qualified Immunity and Brief in Support Thereof* [Doc. No. 88] is **GRANTED**.

**IT IS FURTHER ORDERED** that *Defendants Barela, Dagones, Rapp and Robbins' Motion to Dismiss Count IV of Plaintiffs' Third Amended Complaint for Qualified Immunity and Brief in Support Thereof* [Doc. No. 91] is **GRANTED**.

**IT IS FURTHER ORDERED** that all of Plaintiffs' claims against Defendants Brenda Rapp and Norma Barela are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Counts II, IV, and V of the *Third Amended Complaint* are **DISMISSED WITH PREJUDICE**.

**SO ORDERED**, this 31st day of March 2003, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
*United States District Judge*

-43-